UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X
STONY LODGE HOSPITAL INC.,                                    :
                                                              :
                                        Plaintiff,            :        **COMPLAINT**
                          -against-                           :
                                                              :
THE VILLAGE OF OSSINING, MAYOR VICTORIA GEARITY,              :        **JURY TRIAL**
THOMAS WARREN, ABRAHAM ZAMBRANO, LORI LEE                     :        **DEMANDED**
DICKSON, ANDREW TIESS, DALE FERREIRA, MICHAEL                 :
DEMARTINO AND VARIOUS JOHN/JANE DOES,                         :
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS              :
POLICY MAKERS, SUPERVISORS AND/OR EMPLOYEES                   :
OF THE VILLAGE OF OSSINING,                                   :
                                                              :
                                        Defendants.           :
-----------------------------------------------------------------------------------X

Plaintiff, Stony Lodge Hospital, Inc. ("SLH"), by and through its attorney, John F.
Schutty of The Law Office of John F. Schutty, P.C., complaining of the Defendants,
respectfully alleges:

## JURISDICTION & VENUE

1.      This action arises under the Constitution of the United States, particularly
the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the
United States through the Civil Rights Act, Title 42 U.S.C. §§ 1983 and 1988, as well as
Article I, §§ 1, 5, 6, 9 and 11 of the New York State Constitution, for the violation of
Plaintiff SLH's civil rights.

2.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and
1343.

3.      This Court also has supplemental, ancillary and pendant jurisdiction to
adjudicate all claims asserted under state law herein under 28 U.S.C §§ 1367.

4.     The acts and transactions constituting the civil rights violations occurred in the County of the Westchester, in the Southern District of New York.  In addition, Defendants reside, are found, have agents, or transact their affairs in the Southern District of New York.  Venue is therefore, proper in this district pursuant to 28 U.S.C. §§ 1391 (b).

## PRELIMINARY STATEMENT

5.     In this action, Plaintiff Stony Lodge Hospital, Inc. ("Plaintiff" or "SLH") seeks to recover money damages and attorneys' fees (and expenses) for the constitutionally improper conduct of the Defendants when Plaintiff rightfully chose to challenge, annul and vacate two Water Bills issued by Defendant Village of Ossining ("Ossining" or "Village") for property located at 40 Croton Dam Road in Ossining, New York 10562 (hereinafter the "Property") under water Account Numbers 04-0713201-0 and 04-0713202-0.  These Water Bills, dated April 8, 2015, sought to charge Plaintiff a total of $218,081.10 based on Ossining's (through its employees, representatives and agents) mistaken and capricious allegation that Plaintiff received and used more than 15 million gallons of the Village's water between February 20, 2015 and March 20, 2015, a 28-day period.

6.     The Water Bill for Account Number 04-0713202-0 ("Fire Suppression Bill") was for $212,034.52 based on an alleged flow of 1,990,700 cubic feet of water, or 14,893,118 gallons of water, to the indoor sprinkler systems on the Property.  The alleged flow was wholly without factual support or basis.  For the three months prior to this April 8, 2015 Water Bill, the Fire Suppression Bill for the Property, was only $37.50 per month, which is solely a fixed, non-use-based administrative charge, because the sprinkler systems were inactive and continued to be inactive prior to, throughout, and

after the periods in question.

7.    The Water Bill for Account Number 04-0713201-0 ("Potable Water Bill") was for $6,046.58 based on an alleged usage of 56,600 cubic feet of water, or approximately 423,444 gallons of water. The alleged flow also was without factual support or basis.  For the three months prior to the April 8, 2015 Water Bill, the Potable Water Bill for the Property, had averaged only about $149 per month, because the facility had been inactive since the spring of 2012.

8.    The Fire Suppression Bill and the Potable Water Bill are collectively referred to herein as the "Water Bills" and the water account numbers under which the Village issued those bills to Petitioner are collectively referred to herein as the "Water Accounts."

9.    Plaintiff was compelled to file an Article 78 proceeding at great expense and trouble so that its challenge to the Water Bills – as wildly excessive, inaccurate, and not reflective of the water actually received, used and/or consumed by Plaintiff – was preserved within the short fourth month statute of limitations for challenging the Defendants' administrative decision to deny Plaintiff a proper hearing or investigation. The latter administrative decision was made by the Defendants despite the fact that Plaintiff never received or used anywhere near such an excessive volume of water at its Property, despite the fact there was absolutely no indication or physical evidence that such a voluminous, exorbitant amount of water leaked or was otherwise released at the Property, and despite the fact that the Village and its personnel knew that Plaintiff's water meters had not been properly interpreted (before the Article 78 action had to be filed).  In short, not only did the Water Bills lack a rational basis (they were arbitrary and capricious), but the Village and its agents intentionally or with reckless disregard

chose not to disclose evidence concerning the misreading of the water meters before substantial money and effort was expended on an Article 78 proceeding that was necessarily filed to prevent the Village's threat of liens, penalties and interest.

10.     In fact, the evidence establishes that the Defendants negligently misread the water meters by ignoring and/or omitting a crucial decimal point on the meters, errors that caused the Defendants to read the water usage as being ten times higher than indicated on the meter and then purposely secreted knowledge of this error.

11.     By this action, Plaintiff seeks money damages for the fees and expenses it incurred by virtue of the wrongful conduct of the Village and its agents in secreting evidence of their meter-reading error.

## THE PARTIES

12.     At the time of the acts alleged herein, Plaintiff SLH was, at the time of the acts alleged herein, a New York State corporation doing business at 40 Croton Dam Road, Ossining, NY, County of Westchester.

13.     At all times referred to herein, Defendant The Village of Ossining ("Ossining" or "Village") was and still is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York, and situated within the Southern District of New York.

14.     At all times referred to herein, Defendant Victoria Gearity (hereinafter "Gearity") was and is the elected Mayor for Ossining, Defendant Thomas Warren (hereinafter "Warren") was the Ossining Treasurer, Defendant Abraham Zambrano (hereinafter "Zambrano") was the Ossining "Manager," Defendant Lori Lee Dickson (hereinafter "Dickson") was the Ossining Corporation Counsel, Defendant Andrew Tiess (hereinafter "Tiess") was the Ossining Water Department Superintendent, Defendant

Dale Ferreira (hereinafter "Ferreira") was the Deputy Ossining Treasurer, Defendant Michael DeMartino (hereinafter "DeMartino") was the Ossining Water Department Supervisor, and various John/Jane Doe were various employees of the Village of Ossining.

15.     Upon information and belief, at all relevant times described herein, Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, were acting within the scope of their employment.

16.     Upon information and belief, at all relevant times described herein, Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, were acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the Village, the County of Westchester, and State of New York and under the authority of the Village's Mayor, Gearity.

17.     At all relevant times described herein, the Defendant Village, by its agents, servants, and representatives, was responsible for the operation, maintenance and control of its employees and appointed officials, and the selection, training, supervision, evaluation and disciplining of personnel employed or appointed by the Village.

18.     At all relevant times described herein, Defendant Gearity was the responsible policy maker for the Defendant Village with respect to the management of the Village and its employees, agents and representatives.

19.     At all relevant times described herein, Defendants Gearity, Dickson, Tiess, Zambrano, and various John/Jane Does Defendant employees of the Village, acted on

behalf of the Defendant Village as municipal policymakers with the granted authority to: (a) determine what bills should be issued for water usage, (b) determine what information and records should be gathered and disclosed during the investigation and pursuit of individuals and entities who failed to pay alleged Water Bills timely, (c) determine what penalties and interest should be charged to entities and individuals who fail to pay Water Bills immediately, (d) determine what hearings should be granted to entities or individuals who claim that Water Bills are incorrect, (e) ensure that hearings on Water Bills were/are conducted thoroughly, fairly and diligently,  (f) ensure that evidence was/is not withheld or falsified at any such hearings, (g) ensure that the Village employees thoroughly investigate anomalous Water Bills and provide full and fair information to those charged with failing to pay such anomalous Water Bills, (h) ensure that arguments are not asserted that have no basis in fact and law, (i) conduct thorough and diligent investigations to protect the rights of the innocent, and (j) ensure that evidence is properly registered, stored, preserved, maintained and produced in a timely manner to an entity or individual charged with an anomalous Water Bill.

## NOTICE OF CLAIM & ARTICLE 50(H) HEARING

20.     On May 15, 2015, Plaintiff served a formal Notice of Claim upon the Defendant Village claiming, among other things, that the Village had improperly charged SLH for water that was not provided to SLH.

21.     On June 4, 2015, the Defendant Village served a "Demand for 50H Hearing" upon SLH for the taking of testimony from an SLH representative on July 23, 2015.  The latter examination was adjourned, upon consent, and no new date for this taking of testimony was ever rescheduled.

22.     Defendant Village thereafter failed to settle Plaintiff SLH's claim for damages and refused to reduce SLH's Water Bills (or retract penalties and interest on those charges), prior to the filing of an Article 78 proceeding requiring the expenditure of a large sum of money on attorneys and staff in preparing for that proceeding.

23.     Plaintiff SLH has, therefore, satisfied all conditions precedent for the filing of the within action.

## INTRODUCTION TO THE CLAIM

24.     On August 7, 2015, Plaintiff SLH was compelled to file (at the advice of its legal counsel) an Article 78 proceeding in the Supreme Court of the State of New York, County of Westchester, to preserve the right to challenge the incorrect Water Bills and penalties imposed by the Defendant Village prior to the four month period established by CPLR 217(1) (four months start to run when "the determination to be reviewed becomes final [Water Bills were deemed final] and binding by the petitioner . . . or after the respondent's refusal, upon the demand of the petitioner . . . to perform its duty [to verify the accuracy of the meter readings] . . . ."). *See In the Matter of the Application of Stony Lodge Hospital, Inc. v. Village of Ossining*, Index No. 00274111S (S. Ct. West. Co.) (hereinafter "Article 78 Proceeding").

25.     Plaintiff SLH was compelled to file the aforementioned Article 78 Proceeding because Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino and various John/Jane Doe Defendants wrongfully assessed water charges against SLH in April 2015 and consistently refused to alter the Water Bills despite SLH's pleas; much more egregiously, these Defendants withheld available evidence (*i.e.*, evidence available long before the filing of the Article 78 Proceeding) showing that the

Water Bills were known to be incorrect when a hearing/meeting was held with SLH personnel on July 10, 2015; the Defendant Village and the other named Defendants herein continued to insist that the meter readings and Water Bills were accurate -- on July 10, 2015, and up and through the date when the Article 78 Proceeding was filed in August 2015.

26.     In short, Defendants Village, Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Doe Defendants, intentionally withheld evidence of their miscalculations of SLH's Water Bills and wrongfully conspired to keep this information from SLH.  SLH was damaged as a result thereof.

27.     Prior to the filing of the Article 78 Proceeding, the Defendants refused to conduct a good faith investigation into SLH's Water Bills, refused to cancel or reduce the Water Bills despite persistent requests by SLH, charged SLH penalties when SLH refused to pay the incorrect Water Bills when demanded, sought to depose SLH in a 50-H hearing rather than work on a resolution of the problem, and only agreed to toll the statute of limitations for the Article 78 Proceeding a few days before that limitations period terminated, and then only after SLH had advised the Defendants that a lawsuit was going to be filed and that SLH had already incurred substantial expense putting together all of its papers in support of the Article 78 Proceeding.  Counsel for SLH, however, advised SLH that only the Court could allow the tolling of a statute of limitations, and that SLH could not rely on the Village's proposed stipulation/waiver.

28.     In the course of the Article 78 Proceeding, counsel for the Defendant Village (John Walsh, Esq.) went so far as to wrongfully allege in an October 19, 2015 Affirmation that Village officials first became aware of the misreading of SLH's water

meters *on August 10, 2015*, rather than the true dates – (a) when the misreading of the water meters first should have been known (on June 3, 2015 when Ossining employees took photographs of SLH's water meters), or (b) when the misreading of the meters became admittedly known to the Defendants (during a morning meeting of Village personnel on July 10, 2015).

      29.    Attorney Walsh alleged in his affirmation that:

> This **field testing was conducted on August 10, 2015** at which time Mr. DeMartino, was accompanied by Jerry Rispoli of the North American Meter Company.  Numerous tests of the meter were conducted and it was again verified that the meter was accurate and working properly. However**, the testing showed that there was an improper placement of a decimal point on the reading of the meter which caused the Village's computer to believe that ten (10) times as much water had flowed through the meter then had actually been the case.**

Affidavit of John Walsh, Esq. dated October 19, 2015, ¶ 21 (emphasis added) (Exhibit A annexed hereto).

      30.    Beginning as early as July 27, 2015, SLH began serving Freedom of Information Law ("FOIL") requests upon the Village, and, later, Notices of Failure to Produce, all of which the Village, in further violation of SLH's civil rights, ignored and refused to comply with, either ignoring the requests, or, one occasion, sending some documents unrelated to the request filed.  After these repeated requests by SLH, finally, on **April 27, 2016** — nine months after the first request— and too late for SLH to use in demanding correction of the Water Bills prior to being forced to file an Article 78 proceeding— the Defendant Village finally produced shocking documents showing that Village officials took photographs of SLH's water meters on June 3, 2015, and that the Defendants herein knew definitively, on or before a morning email was dispatched on **July 10, 2015** that: (a) Village officials had incorrectly read SLH's water meters, and (b)

should have known that SLH had been charged incorrectly with water charges, penalties and interest.  *See* July 10, 2015 Email sent by Defendant Thomas Warren to Defendants Abraham Zambrano, Lori Lee Dickson, Andrew Tiess and Dale Ferreira at 11:31 a.m. (Exhibit B annexed hereto):

> Abe, Lori Lee and Andy,
> Mike DeMartino brought in pictures of the Stony Lodge water meters that were read on 6/03/2015.  Mike recalled that Water Dept employee Robert Moore had taken pictures that day on his cell phone.  See attached pictures as a PDF file.  **The picture of the large flow consumption meter shows that there is a tenths digit at the end (see the decimal point in the picture; the older gear meters, like at the Prison, do not have a tenths digit), so that we should probably be reading 6 digits from the left, not 7 digits.**  Accordingly, the reading would be "2002 CCF" (CCF is hundred cubic feet), not "20024 CCF".  The low flow meter has two places after the decimal point (not as clear in the picture) and is read correctly - "4868 CCF".

31.    Other FOIL documents finally produced by the Village on or about April 27, 2016 show that Defendants Dickson, Zambrano and DeMartino met on July 9, 2015 to review the June 3, 2015 photographs of the SLH meters, along with instructions on how to properly read SLH's meters, and that these Defendants knew that SLH water meters had been incorrectly interpreted, even while they then met with SLH representatives on July 10, 2015, and denied that there were any billing errors during the latter face-to-face meeting.

32.    The admitted misreading of the water meters should have been timely reported to SLH to avoid the filing of the Article 78 Proceeding.

33.    Notwithstanding this undeniable knowledge, Village employees continued to dispute SLH's allegations of incorrect billing at this meeting held with SLH representatives during the afternoon of July 10, 2015 – and in discussions thereafter – and subsequently compelled SLH to incur legal fees and expenses in filing an Article 78

Proceeding on August 7, 2015.  It was not until September 2, 2015 – well after the deadline for filing an Article 78 proceeding to protect SLH's rights – that the Village casually mailed a correction of the bills, reducing them by $191,573.  SLH did not learn of this wrongful behavior until April 27, 2016, when it finally received FOIL documents from the Village requested nine months earlier, before the Article 78 Proceeding was filed.  It was not until the April 27, 2016 document production that Plaintiff discovered what had been improperly secreted.

## BACKGROUND

### The Property

34.     SLH's Property is approximately eighteen (18) acres in size. Sixteen (16) acres of the Property are located in the Town of Ossining, and the remaining two (2) acres are located within the limits of the Village.

35.     The Property was improved with eight (8) buildings, commonly known as the Main Building (est. 15,652 square feet (sf)), North Building (est. 9,452 sf), East Building (est. 9,204 sf), Recreation Building (est. 4,733 sf), Administration Building (est. 2,915 sf), South Cottage (est. 2,329 sf), Maintenance Building (est. 2,231 sf) and West Lodge (est. 2,178 sf).

36.     The Property receives all of its water from the Defendant Village, as do most of the properties in the Town of Ossining not on well water.

### The History of the Property and Plaintiff's Operations

37.      In 1927, a physician purchased the Property and established the Stony Lodge Hospital ("Hospital") to provide psychiatric services, initially for adults and then later for disadvantaged, primarily minority, mentally ill children and

adolescents.

38.      During its operation, the Hospital was a 61-bed, inpatient, short-term, acute care psychiatric hospital licensed as a Hospital for the Mentally Ill by the New York State Office of Mental Health ("OMH").   At its peak, the Hospital employed approximately 250 full time and part-time employees and admitted up to 600 child and adolescent patients a year.

39.      In or about 1985, Plaintiff purchased the Hospital, including the Property, and continued to provide the aforementioned psychiatric and hospitalization services.

## The Cessation of Operations at the Property

40.      In May of 2012, the Hospital was finally forced to cease its inpatient operations at the Property due, in part, to financial burdens.

41.      Since May 2012, Plaintiff has not offered any inpatient services at the Property.

42.      Since the closing of the Hospital's inpatient units and the termination of approximately 250 employees and staff in the spring of 2012, Plaintiff's primary focus at the Property has been to (i) preserve the buildings, (ii) respond to information requests concerning former patients and employees, and (iii) explore alternative uses of the Property.

43.      In 2015 the Property was occupied by a live-in groundskeeper and by the hospital's Executive Director, his wife and his son, a combined total of four people.

44.      In 2013, Plaintiff began to reduce services (heat, water, some electric) in some of its inactive buildings, including the Recreation Building, the West Lodge

and the South Cottage.

45.     Then, in October 2014, Plaintiff shut down the boilers and turned off the water supply to the inactive Main Building, North Building and East Building. Heat and water service was discontinued in these inactive buildings because Plaintiff became increasingly concerned about operating the boilers.

46.     As of October 2014, therefore, the only active buildings on the Property with heat and water have been the small Maintenance Building and the small Administration Building, where the four on-site residents resided.

**Defendant Village**

47.     According to its 2009 Comprehensive Plan, the Defendant Village has employed a Department of Public Works that operates its municipal water system; this system supplies water to the Village, to the Sing Sing Correctional Facility, to Briarcliff Manor, and to the Town of Ossining.

48.     The Defendant Village gets its water from two surface water sources: (i) the Croton Reservoir, which is part of the New York City Water System, and (ii) the Indian Brook Reservoir, which is owned by the Village and located at 25 Fowler Avenue, Ossining, NY.

49.     The Village blends the water from these two water sources and treats it at the Village's Indian Brook Water Filtration Plant ("Filtration Plant").  The treated water is then pumped into the distribution system for the public's use.  The Village's treatment and distribution system has a total capacity of 6 million gallons of water per day.

50.     As stated in the Village's Annual Drinking Water Quality Report for 2014 ("2014 Village WQ Report"), prior to 2015, the Village's Filtration Plant and its

distribution system were upgraded to enable the Village to determine water usage in each pressure zone and to enable the Village "to control and monitor [its] Distribution Pump Stations."  Upon information and belief, these upgrades enabled the Defendant Village to immediately detect unusual increases in flow rates and/or water use, thereby enabling it to readily identify possible leaks and/or water losses.

51.     Most of the properties served by the Village's water distribution system are billed for water usage on a quarterly basis.   However, commercial properties like Plaintiff's Property, are billed on a monthly basis.

### The Property's Water System

52.     In 2011, Plaintiff was required to install both a backflow prevention system and a new combined water meter, and Plaintiff had to replace all of the main potable water lines on the Property because they had corroded over the years and provided insufficient water pressure.   The meter was specified by, and sold by, the Village, which should have been familiar with, reading of its meters.   At the same time, the Village required SLH to install two replacement fire hydrants and add an additional fire hydrant on the Property, for a total of three on-site hydrants.

53.     Upon information and belief, there is one water main that enters Plaintiff's Property, which feeds into a combined meter in the on-site meter pit, and then supplies water to the potable water lines, the lines to the outside fire hydrants and the lines to the indoor sprinkler systems in three of the buildings: (i) the Main Building, (ii) the North Building and (iii) the East Building.

54.     Before being distributed, the Village's water is piped to the Property through a combined water meter manufactured by Neptune Technology Group,

which is designed to measure both domestic and fire service/sprinkler water usage through a single water line. A combined meter enables the use of one water line to supply potable water as well as fire suppression water.

55.     As explained on the Neptune product sheet: "At low flow rates, all flow is through the bypass meter. As flow increases, pressure loss through the bypass meter increases and the detector check valve automatically opens. This condition occurs, for example, when a fire hydrant or a fire sprinkler system goes into operation. This permits flow through the mainline turbine meter. As flow decreases, reduced pressure loss closes the detector check valve and flow is again directed through the bypass meter."

56.     Upon information and belief, therefore, the combined water meter measures water usage based on the rate of flow: a slower rate of flow is indicative of potable water usage and is measured by the bypass meter and charged to the Potable Water Account, whereas a faster rate of flow is indicative of the flow of water to the indoor sprinkler systems and/or to the outdoor fire hydrants and is measured by an alternate meter and charged to the Fire Suppression Account.

57.     The combined meter measures water usage by the cubic foot. However, the manner in which the two meters register and display water use is slightly different. Specifically, the potable water meter measures usage to the hundredths, whereas the fire suppression meter measures usage to the tenths.

58.     The Village uses an automated meter reader to determine water usage at the Property. This enables the Village to read the meter from a distance and obviates the need for Village personnel to climb into the meter pit and take visual readings from the combined meter.

59.    Upon information and belief, the automated meter reader must be properly calibrated in order to take reliable and accurate meter readings.  Otherwise, it will not report reliable and/or accurate results, which can result in overcharges for water use and consumption.

60.    The exact configuration and operation of the water distribution and metering system on the Property was under review and the subject of at least one FOIL request that was served on the Village by SLH on or about July 27, 2015, but ignored by the Village.

### Historical Water Usage

61.    Prior to its closure in or about May 2012, SLH housed 61 inpatients at a time, treated dozens of outpatients, employed approximately 250 full-time and part-time employees and provided food service 24/7 for staff and patients.  Even with this peak activity, the highest potable water bill ever received by Plaintiff for a single month period during this time was for about $4,500 in August 2011.

62.    During the year 2010, when the facility was fully operational and providing inpatient services, Plaintiff's annual water charges totaled $32,504.78, an average of $2,708.73 per month.

63.    In the year 2011, when the facility was still fully operational and providing inpatient services, Plaintiff's annual potable water charges totaled $42,322.40, an average of approximately $3,526.87 per month.

64.    By May 2012, the facility had ceased servicing patients on site and by August 2012, Plaintiff's potable water usage was minimal due to the steady and significant decline in both on-site employees and the provision of on-site services.

Accordingly, the annual water charges for 2012 decreased to $23,117.85, an average of $1,926.49 per month.  This was the first full year that Plaintiff received two separate Water Bills, the Potable Water Bill and the Fire Suppression Bill.  The latter added an additional $1,102.13 in fire suppression water charges over the course of the year, an average of an additional $91.84 per month.   These were mainly fixed, non-usage based administrative costs, though there were some minimal, actual water usage charges that may relate to, *inter alia,* backflow and/or fire hydrant testing.

65.     The year 2013 was the first full year that the Property was inactive and unoccupied, except for the maintenance of the grounds and the administrative records by one employee.   As a result, the total yearly Fire Suppression Bill in 2013 was only $539.43 (representing mostly fixed, administrative charges and minimal usage) and the total yearly Potable Water Bill was only $5,292.93, for a combined yearly total in 2013 of only $5,832.26.   This equates to an average monthly combined water charge of only $486.03 for both accounts.   By 2013, therefore, Plaintiff's water use had drastically declined compared to prior years.

66.     In 2014, the total yearly Fire Suppression Bill decreased even further to only $490.60 (again representing mostly fixed, non-usage based charges) and the total yearly Potable Water Bill also decreased further to $2,326.80, for a combined yearly total in 2014 of only $2,817.40.  This equates to an average monthly combined water charge of only $234.78 for both Water Accounts in 2014.

## The Unexpected and Extraordinary Water Charges in 2015

67.     Plaintiff expected even greater Water Bill reductions in the year 2015. For example, the total combined water charge for the period December 19, 2014 through

January 20, 2015 was only $200.81 and the total combined water charge for the period January 20, 2015 through February 20, 2015 was only $170.85.

68.    These minimal amounts reflect the fact that (i) no water was flowing through the sprinkler systems and/or to the fire hydrants (resulting in zero water usage under the Fire Suppression Account) and (ii) only four people resided on the Property in February 2015, and no water was used for landscaping or irrigation of the Property, resulting in minimal potable water use.

69.    On or about April 8, 2015, however, Defendant Village unexpectedly sent Plaintiff the anomalous Water Bills at issue.  The Fire Suppression Bill was for an outlandish amount of $212,034.52 and was allegedly based on Plaintiff's alleged usage of 1,990,700 cubic feet of water, the equivalent of approximately 14.9 million gallons of water during, at most, a 28-day period.  The Potable Water Bill was for an inexplicable $6,046.58 and was based on Plaintiff's alleged usage of 56,600 cubic feet of water, the equivalent of approximately 423,444 gallons of water during, at most, the same 28-day period.

70.    In other words, in April 2015, Defendant Village sent Plaintiff Water Bills for the alleged usage of *more than 15 million gallons of water over, at most, a 28-day period.*  This is equivalent to an average daily use of 535,714.28 gallons of water a day at a predominately inactive, unoccupied facility that had no fire events and did not suffer or experience any significant water damage on the grounds or in any of the buildings.

71.    In 2014, the Village sold an average total of 2.74 million of gallons of water per day to the *entirety* of its users, which means that the April 2015 Water Bills

(reflecting the alleged use of *at least* 535,714 gallons per day) charged Plaintiff for approximately 19% of the total water that the Village provided to over 6,000 consumers.

72.    If Plaintiff had, in fact, received 15 million gallons of water from the Village system over a 28-day period, this is equivalent to the receipt of 535,714 gallons of water each day.  Since water flowing at a steady rate of 1 gallon per minute equates to 1,440 gallons a day, this means that in order for Defendants' Water Bills to have been correct, water had to be flowing at the Property at a rate of 372 gallons *per minute* every day for 28 days.

73.    The amount of water use capriciously charged to Plaintiffs would be equivalent to a catastrophic loss of water every day for 28 straight days – a water loss that never went noticed by: (a) Plaintiff, (b) any of the residents surrounding the Property, or (c) the Village itself because - despite the water pressure detection capabilities of the Village's upgraded distribution system - the Village never once notified the Plaintiff of any unusual or significant changes in water pressure or usage.  Such a flood of water would have caused catastrophic damage on the SLH property, to the SLH buildings, and in the neighborhood; it also would have led to a large number of calls to the police and fire departments, due to the massive flooding in the area, with flooded roads.  In contrast, there was no evidence of damage to any of the SLH buildings or grounds and no sign there or in the neighborhood of these multiple football-field sized amounts of water flooding the area.  SLH informed the Village of these obvious facts, but the Village chose to ignore SLH.

74.    Since Plaintiff did not use or receive sprinkler water, did not use the fire hydrants and only used a minimal amount of potable water for the four residents of the

Property, the alleged 15 million gallons - a significant and excessive volume of water - would need to be explained by something other than Plaintiff's use of water; for example, there would have been massive leaking from the water system.  However, there was never any evidence of any such massive water leak at Plaintiff's property.

### The Village Inspects the Meter

75.     On or about April 8, 2015, the same day it generated the Water Bills being challenged in this proceeding, several Village employees entered the Property unannounced and went to the meter pit, which housed the combined meter that recorded Plaintiff's usage of potable and fire suppression water.  They had a ladder to enable them to enter the pit, which is ten to twelve feet deep, and access the combined meter, which is inside the meter pit approximately eight (8) feet down.

76.     The Village employees told Plaintiff's Executive Director, Kevin Czipo, that they were on the Property to go to the meter pit to check the meter; they referenced a problem they were· trying to resolve and the fact that there had been a lot of broken pipes around the Village that winter.  They did not provide Mr. Czipo with any further information and did not notify him of any significant water loss in the system or of the excessive Water Bills that had likely prompted their visit and inspection of the meter.

### Plaintiff's Challenge of the Water Bills

77.     Prior to sending the Water Bills, the Village never contacted Plaintiff to alert SLH that it was about to be charged with the usage of millions of gallons of water, or that the water usage on the Property had exponentially increased, in one month, from usage during prior months and years.  This is a notable omission by the Village, because its upgraded distribution system should have alerted it of such a heavy increase in water

use and/or loss at the Property.

78.     Plaintiff received the Water Bills on or about April 15, 2015.

79.     By letter, dated April 22, 2015, Plaintiff challenged the Water Bills as astronomical and inaccurate and as not reflective of the water actually received or consumed by Plaintiff.

80.     On or about May 15, 2015, Plaintiff filed a Notice of Claim against the Village alleging damages as a result of the Village's failure to properly control, monitor, maintain and/or supervise the water system servicing the Property.   In addition to the excessive water charges, Plaintiff alleged that it incurred significant costs and legal fees as a result of the Defendant's negligence and failure to amend the Water Bills.

81.     On or about May 18, 2015, Corporation Counsel for the Defendant Village notified Plaintiff, through its counsel, that it would investigate the matter.

82.     Then, by letter, dated May 21, 2015, Defendant Village advised Plaintiff, again through its counsel, that it had reviewed Plaintiff's complaint regarding the Water Bills and had determined that there was "no factual basis or legal authority for the Village to grant your request for 'elimination' [sic] any of the billed charges for water usage reflected on the invoices."

83.     Thereafter, Plaintiff continued to communicate its complaints regarding the accuracy of the Water Bills to the Defendant Village.

84.     On or about July 10, 2015, Plaintiff met with Defendant Village, through its agents and representatives, to discuss the Water Bills and the volume of water usage charged through those bills.  Plaintiff's President as well as its Executive Director were in attendance, along with a representative of their insurance brokerage, as was the Village's

Manager, Defendant Zambrano, and the Assistant Village Manager.

85.     At the July 10, 2015 meeting, Plaintiff explained to the Village Representatives that the Water Bills and the amount of water usage on which they were based were unreasonable and that it was impossible for Plaintiff to have consumed or lost such an exorbitant amount of water. Plaintiff's representatives further explained that they had inspected the Property during the period covered by the Water Bills and had only found minor leaks inside the buildings, which were immediately repaired and could not account for such a high volume of water usage.

86.     The representative of Plaintiff's insurance brokerage, who had inspected the cracked valves and who had many years of experience and has been involved in a significant number of water remediation issues over the years at properties in many states, agreed and reported at this meeting that the handful of minor leaks found inside the building could not account for the loss of a high volume of water, particularly in the absence of any notable physical damage and no evidence of significant water discharges on the Property.

87.     At the July 10, 2015 meeting, the Village representatives claimed that they had inspected the meter *and that there was nothing they could do to change the Water Bills*. Although the Village Manager had photographs of the meters with him, he did not share those photographs with Plaintiff. At the meeting, Defendant Zambrano stated, with great certainty, a number of things, all of which were proven a year later to be falsehoods:

        a.   Pointing to a file in front of him, he said the Village had records of SLH's daily (not just monthly) usage. A SLH representative asked why

SLH was not contacted, if the Village had such detailed records and monitoring going on, and presumably, alarms for such a massive water leak.

b.   Pointing to records in front of him (but not shared with SLH), he said that during the month in question, the millions of gallons of water allegedly used were spaced out during the entire month, daily, and not just during a brief period—[meaning over 500,000 gallons of water daily for an entire billing period].

c.   When it was pointed out to him that it must have been some miraculous type of leak to start on the first day of a billing period, and end on the last day, and not beyond that, he said that is exactly what happened according to the Village's records.

d.   Pointing to a picture of the face of a water meter on top of the folder in front of him, which he said was SLH's, but did not share with the SLH representatives, he said that Village personnel had checked the meter reading again, and insisted it was accurate, and that there would be no lowering, or negotiating of a lowering, of the bill.  SLH representatives said SLH did not have the financial resources or cash to pay such an extraordinary bill; Zambrano said it was not going to be reduced, and, in fact, said that penalties and interest would commence if not paid promptly. Later the Village threatened to place a lien on the property for payment of the bill.

88.     Thereafter, on or about July 29, 2015, Plaintiff with some dangerous

difficulty, accessed the underground, concrete meter pit on the Property which houses the combined meter for the Fire Suppression Account and the Potable Water Account. This meter pit is at located at the bottom of a hill, has a heavy metal cover, and is ten to twelve feet deep, requiring the use of a ladder to access the combined meter inside. The combined meter cannot be read from the top of the pit and, to complicate matters, is usually submerged under water, as it is designed to be and SLH had been told that snakes were sometimes found in such pits.

89.     On July 29, 2015, however, the combined meter was not fully submerged under water and Plaintiff was able to access and enter the meter pit and read and photograph the fire suppression meter and potable water meter on the combined meter unit. The meter reading for the Fire Suppression Account was "00200245.5" cubic feet, which indicates that as of July 29, 2015, only 200,245.5 cubic feet of water might have flowed through this meter. The April 8, 2015 Water Bill for the Fire Suppression Account, however, sought to charge Plaintiff SLH for a significantly greater amount of water, namely 1,990,700 cubic feet.

90.     Because it is impossible for Plaintiff's water consumption to have decreased since the winter and spring and for the meter to have rolled back its numbers after April 8, 2015, the July 29, 2015 meter reading firmly established that the April 8, 2015 Water Bill for the Fire Suppression Account was erroneous.

91.     Starting with the April 8, 2015 Water Bill, the Village has now admitted that it had been misreading the meter for the Fire Suppression Account. This meter carries its cubic foot reading to one number after the decimal point to measure water usage by the tenths. In reading the meter, however, the Village had

been *omitting* the decimal point so that the meter reading of "00200245.5" was being read by the Village as "002002455" or as representing the usage of 2,002,455 cubic feet of water.  Because the Village billed in units of 100 cubic feet (CF), this is represented on the Water Bill as 20024 units of l00 CF, as indicated by the July 7, 2015 Water Bill for the Fire Suppression Account.

92.    This was not the first time the Village had made this ten-fold billing mistake. Back in 2011, after the new combined water meter required and sold by the Village was first installed, the Village billed Plaintiff for $105,000 for three months of potable water usage. When SLH complained that this was excessive and had to be an error, the Village agreed and revealed it had made a mistake reading the meter and quickly reduced the bill ten-fold to $10,500 with only a phone call from SLH.  In 2016, when the secreted FOIL documents were finally provided by the Village, it was noted in the documents produced that, in addition to negligently billing SLH in 2011, the Village had also done this to certain other customers, including the State prison in Ossining, so Village staff were, or should have been, well acquainted with their history of negligent and careless billing of customers.

93.    By letter, dated July 31, 2015, Plaintiff urgently notified the Village of its findings and provided the Village with a photograph of the meter reading for the Fire Suppression Account.  By this letter, Plaintiff once again asked the Village to rescind and withdraw the April 8, 2015 Water Bill for the Fire Suppression Account.

94.    By its July 31st letter, Plaintiff also asked the Village to rescind and withdraw the April 8, 2015 Water Bill for the Potable Water Account because that bill was exponentially higher than it had been in prior months, for no explainable

-25-

reason.   In the same letter, Plaintiff notified the Village that there was the greatest urgency to the Village's agreeing to the clear proof that the Village's billing was in error, because the deadline arising from the statute of limitations for filing an Article 78 proceeding was days away.

95.    In response, rather than simply looking at the obvious evidence, and the past history of a similar error in SLH's 2011 billing, or sending staff to look at the meter yet again, (a process that could have been completed in minutes), the Village refused to send anyone or admit its error, and instead responded to Plaintiff's urgent request to avoid having to file the Article 78 Proceeding with the following written statement: "Stony Lodge fails to recognize that Municipal officials have other duties to attend to besides those faced by one (1) individual entity."  Their massively insulting letter seems to falsely suggest that bills of over $231,000 for one customer with four individuals in residence for over 15.5 million gallons of water are an everyday event in the Village and no reason for prompt municipal assistance to this "one (1) individual entity."

96.    After that letter, adding insult to injury, the Village purposely and maliciously waited 12 additional days (four months after their first inspection) to come and re-inspect and agree that the billing was in error—knowingly well after the deadline for filing an Article 78 Proceeding, which SLH was forced to file to protect its rights. The Village later claimed that it had expeditiously and diligently investigated SLH's complaint, as if the Village had done it on its own initiative.  The simple fact is that after the inspections of the SLH meters on April 8, 2015 and June 3, 2015 by Village staff, and the third inspection on August 10, 2015, and after SLH provided the same photographic evidence that could not be ignored (identical to what was long in the Village's own

possession), nothing whatsoever was done by the Village to investigate its error, which forced SLH to file the Article 78 Proceeding.

97.     Defendant Village knew or should have known that the April 8, 2015 Water Bills were erroneous and did not reflect the actual volume of water received and/or consumed by Plaintiff during the period covered by those bills.  In fact, Defendant Village had actual and/or constructive notice that: (a) the April 8, 2015 Water Bills charged Plaintiff for water usage far in excess of Plaintiff's historical water usage at the Property; (b) the water volumes set forth on the April 8, 2015 Water Bills, if accurate, would have immediately alerted the Village to a substantial increase in water demand at its water-filtration and distribution facility, which did not happen; (c) the water volumes set forth on the April 8, 2015 Water Bills were too high to have been consumed or used by Plaintiff at the Property and, if accurate, had to be attributable to major leaks and/or discharges of water that would have caused catastrophic damage and/or flooding at the Property and even the neighborhood, which the Village knew had not occurred; (d) the Village ignored and/or omitted a decimal point in reading the meter for the highest of the two April 8, 2015 Water Bills and this error caused the Village to charge Plaintiff at least ten times the amount indicated on the water meter; and (e) the Village and the other Defendants named herein knew from photographs taken of the meters on June 3, 2015 that the Village and its people were misreading the meters, but they secreted that evidence and knowledge.

98.     Despite having actual and constructive notice that the Water Bills were excessive beyond reason, and despite Plaintiff's repeated requests that the April 8, 2015

Water Bills be corrected, and despite the June 3, 2015 photographs and July 9, 2015 meeting, the Defendant Village (and Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village) failed to conduct a good faith investigation into the accuracy and plausibility of the April 8, 2015 Water Bills, failed to conduct a reasonable and good faith investigation of Plaintiff's combined water meter to verify the meter readings, failed to conduct a reasonable and good faith investigation of the Village's meter reading equipment to ensure that it was properly calibrated and to confirm that its readings were accurate and reliable, and then secreted its actual knowledge of the misreading of SLH's meters (knowledge that is undeniably set forth in a memorandum summarizing discussions between Defendants Warren, Zambrano, Dickson, Tiess, Ferreira, and DeMartino) thereby causing SLH to incur substantial expense, including attorneys' fees.

### Plaintiff's Damages

99.    SLH suffered substantial injuries and/or damages as a result of the Defendants wrongful actions, including but not limited to the following: the reasonable and necessary attorneys' fees and expenses SLH was required to expend to contest the validity of the incorrect Water Bills.

### LEGAL CLAIMS

### FEDERAL LAW CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AGAINST INDIVIDUAL DEFENDANTS FOR
### THEIR WRONGFUL VIOLATION OF PLAINTIFF'S
### CIVIL RIGHTS UNDER COLOR OF STATE LAW

100.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 99, inclusive, with the same force and

effect as if set forth at length herein.

101.    Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, acting within the scope of their employment and under color of state law: (a) failed to conduct a fair, proper and reasonable investigation into SLH's alleged water usage in April 2015, (b) wrongfully secreted photographic evidence concerning that water usage, (c) failed to disclose to SLH that they knew that the Water Bills were incorrect, and (d) as a result of their action and inactions (and fraud) compelled SLH to file the Article 78 Proceeding to challenge the Water Bills knowing full well that the Water Bills were incorrect due to a misreading of the water meters.

102.    The conduct of Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, in refusing to investigate a patently obvious error and in refusing to correct the astronomical Water Bills, in light of their actual and/or constructive notice that the Water Bills were excessive and lacked any foundation, was intentional and/or made with reckless disregard of Plaintiff's constitutional rights.  Instead of correcting known error, however, these Defendants threatened Plaintiff with penalties and interest and forced Plaintiff to incur tens of thousands of dollars in costs and to commence the Article 78 Proceeding in order to protect its clear rights.  Probative evidence exists to show that these Defendants purposefully lulled the Plaintiff into inaction so that the four-month statute of limitations would run and leave Plaintiff on the hook for baseless water charges of several hundred thousand dollars.

103.    Even after being forced to correct the Water Bills, the Village hid the

proof of its malicious wrongdoing by willfully and repeatedly ignoring Plaintiff's repeated demands under FOIL for over nine months, after which it finally, after protests by SLH, produced the "smoking gun" proof of the violations of Plaintiff's civil rights.

104.   As a direct and proximate result of these wrongful actions, SLH incurred substantial legal fees and expenses, in violation of SLH's constitutional right to access the courts and not be deprived of property and liberty without due process of law.

105.   The aforesaid fraudulent conduct operated, *inter alia*, to deprive SLH of important and well established rights under the First (access to courts), Fifth (due process), Eighth (prohibition against excessive fines) and Fourteenth Amendments (due process) to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right to challenge excessive fines and penalties in the courts, its right to a fair and reliable determination of charges owed to the municipality, its right to be free from excessive fines, and its right to due process of law following a claim of an improper charge by the municipality.  Such misconduct directly and proximately caused significant injuries and expenses.  42 U.S.C. § 1983 provides an appropriate cause of action.

106.   Due to the fraudulent and unconstitutional misconduct of Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, in secreting significant evidence showing that SLH had been improperly charged for water due to a meter misreading and that the aforementioned Defendants refused to disclose their knowledge of the meter misreading, SLH sustained substantial fees and expenses.

107.   Each of the aforementioned Defendants is liable personally and in their

official capacity for these acts which damaged Plaintiff.

108.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff SLH now demands judgment against Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, for compensatory damages totaling One Hundred Thousand Dollars ($100,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SECOND CAUSE OF ACTION**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR THEIR**
**WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS**
**UNDER COLOR OF STATE LAW (CONSPIRACY LIABILITY)**

109.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 108, inclusive, with the same force and effect as if set forth at length herein.

110.    Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, acting within the scope of their employment and under color of state law, agreed amongst themselves and with other individuals to act in concert in order to deprive SLH of important and well established rights under the First (access to courts), Fifth (due process), Eighth (prohibition against excessive fines) and Fourteenth Amendments (due process) to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right to challenge excessive fines and penalties in the courts, its right to a fair and reliable determination of charges owed to the municipality, its right to be free from excessive fines, and its right to due process of law following a claim of an improper charge by the municipality.  Such misconduct directly and proximately caused significant injuries and expenses.

-31-

111.    In furtherance of this ongoing conspiracy each individual Defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Failed to determine properly what bill should be issued to SLH for water usage;

b.    Failed to determine what information and records should be gathered and disclosed during the investigation and pursuit of individuals and entities who failed to pay alleged water bills timely;

c.    Failed to determine what penalties and interest should be properly be charged to entities and individuals who fail to pay water bills immediately;

d.    Failed to schedule hearings to entities or individuals who claim that water bills are incorrect;

e.    Failed to ensure that hearings on water bill charges were/are conducted thoroughly, fairly and diligently;

f.    Failed to ensure that evidence was/is not withheld or falsified at any such hearings;

g.    Failed to ensure that Ossining employees thoroughly investigate anomalous water bill charges and provide full and fair information to those charged with failing to pay such anomalous water bill charges

h. Failed to ensure that arguments were/are not asserted that have no basis in fact and law;

i. Failed to conduct thorough and diligent investigations to protect the rights of the innocent;

j. Failed to ensure that evidence is properly registered, stored, preserved, maintained and produced in a timely manner to an entity or individual charged with an anomalous water bill charge, and,

k. Conspired together to secrete evidence and continued to pursue incorrect water usage charges.

112. The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York.   42 U.S.C. § 1985(3) - Conspiracy to Interfere with Civil Rights – provides a cause of action for appropriate relief.

113. As a direct and proximate result of the conspiracy and actions in furtherance of the conspiracy by Defendants, Plaintiff was forced to retain legal counsel and pursue an Article 78 Proceeding to contest what the Defendants knew or should have known were incorrect water usage charges and excessive fines and penalties.

114. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

115. Thus, pursuant to 42 U.S.C. § 1983 and § 1985, Plaintiff now demands judgment against Defendants Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira,

DeMartino, and various John/Jane Does Defendant employees of the Village, for compensatory damages totaling One Hundred Thousand Dollars ($100,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**THIRD CAUSE OF ACTION
AGAINST THE VILLAGE FOR ITS POLICY
MAKERS' WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL
RIGHTS UNDER COLOR OF STATE LAW (MUNICIPAL LIABILITY)**

116.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 115, inclusive, with the same force and effect as if set forth at length herein.

117.    Municipalities and their subdivisions may be held liable to an individual if they enforce a policy or custom that causes the deprivation of the individual's constitutional rights.

118.    Municipal liability may be based upon:

    a.   a formally promulgated policy;

    b.   a well settled custom or practice;

    c.   a final decision by a municipal policymaker; or

    d.   deliberately indifferent training or supervision.

119.    Defendant Village, by and through its final policymakers, maintained the following unconstitutional customs, decisions, policies, and/or indifferent employee training or supervision practices that allowed for various constitutional violations:

a.  Village personnel systematically failed to disclose to Plaintiff and others material information necessary to determine the legitimacy of water usage charges;

b.  Village personnel systematically fabricated and/or secreted evidence in order to pursue improper water usage charges;

c.  Village personnel systematically abused process by presenting false evidence to Plaintiff and others similarly situated to pursue water usage charges;

d.  Village personnel systematically secreted evidence, or recklessly disregarded the rights of the those charged with water usage to further their personal goals;

e.  Village personnel acted with impunity in destroying meter readings, or by reporting it did not have any meter readings that would explain Plaintiff's anomalous water usage, all the while pursuing incorrect water usage charges (and fines and penalties) from Plaintiff; and

f.  Village personnel were improperly supervised and trained in the reading of water meters and the assessment of water usage charges.

120.   The Village's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices were: (a) deliberately or recklessly indifferent to the obvious risks of injury by Plaintiff, (b) deliberately or recklessly indifferent to the repeated secretion of material information relating to water usage, (c) deliberately or recklessly indifferent to Plaintiff's and others' constitutional rights, and (d) deliberately or recklessly indifferent to the issue of whether water usage charges (and

fines and penalties) were being properly pursued.

121.    The Village's municipality liability here is premised upon, among other things, its failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

122.    The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right to challenge excessive fines and penalties in the courts, its right to a fair and reliable determination of charges owed to the municipality, its right to be free from excessive fines, and its right to due process of law following a claim of an improper charge by the municipality.   Such misconduct directly and proximately caused significant injuries and expenses.

123.    As a direct and proximate result of the Village's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices, Plaintiff was forced to retain legal counsel and pursue an Article 78 Proceeding to contest what the Defendants knew or should have known were incorrect water usage charges and excessive fines and penalties.

124.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff now demands judgment against the Defendant Village for compensatory damages totaling One Hundred Thousand Dollars ($100,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

## STATE LAW CAUSES OF ACTION

### FOURTH CAUSE OF ACTION
### AGAINST DEFENDANTS GEARITY,
### TIESS, DICKSON & ZAMBRANO
### FOR NEGLIGENT TRAINING & SUPERVISION

125.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 124, inclusive, with the same force and effect as if set forth at length herein.

126.    Defendants Gearity, Tiess, Dickson and Zambrano knew or should have known of the need for additional screening, training, supervising and disciplining of personnel to ensure that Village employees: (a) conducted a good faith investigation into the accuracy and plausibility of Water Bills, (b) conducted a reasonable and good faith investigation of the Village's meter reading equipment to ensure that it was properly calibrated and to confirm that its readings were accurate and reliable, and (c) were not secreting actual knowledge of the misreading of water meters.

127.    Through intentional and deliberate indifference and/or a reckless disregard of basic civil rights, Defendants Gearity, Tiess, Dickson and Zambrano failed to provide for adequate screening, training, supervising, and disciplining of her personnel with respect to the foregoing.   This reckless disregard of basic constitutional rights is evidenced by Village employees' miscalculation and misreading of other water meters prior to the period in question.

128.    Defendants Gearity, Tiess, Dickson and Zambrano personally and/or through her authorized delegates, at all relevant times, had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the performance of duties by her

personnel.

129.    Defendants Gearity, Tiess, Dickson and Zambrano breached her duty to train and supervise her personnel to prevent an abuse of authority.

130.    Upon information and belief, personnel employed by Defendants Gearity, Tiess, Dickson and Zambrano have not been disciplined for their misconduct, despite repeated proof of misconduct.

131.    Defendants Gearity, Tiess, Dickson and Zambrano knew or should have known of the need for adequate screening, training, supervising, and disciplining of her personnel and of the inherent risks of permitting the individual Defendants named herein to mishandle the power granted to them.

132.    However, rather than providing more scrutiny and supervision to avoid such an abuse of power, Defendants Gearity, Tiess, Dickson and Zambrano actually fostered and instigated the wrongful conduct of her personnel.  Supervisory personnel and others were apparently directly involved, and became aware of, but ignored, the evidence and strong indications that Plaintiff was being overcharged for water, but these supervisory personnel did not relent in their pursuit of incorrect charges and fines from Plaintiff.

133.    But for the deliberate indifference of Defendants Gearity, Tiess, Dickson and Zambrano in failing to provide adequate screening, training, supervision, and discipline of her personnel, Plaintiff would not have been compelled to file the Article 78 Proceeding.

134.    The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the First (access to courts), Fifth (due

process), Eighth (prohibition against excessive fines) and Fourteenth Amendments (due process) to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right to challenge excessive fines and penalties in the courts, its right to a fair and reliable determination of charges owed to the municipality, its right to be free from excessive fines, and its right to due process of law following a claim of an improper charge by the municipality.  Such misconduct directly and proximately caused significant injuries and expenses.

135.    The foregoing violations of Plaintiff's constitutional rights, and resulting and damages, were directly and proximately caused by the negligent supervision, training and retention of incompetent personnel by Defendants Gearity, Tiess, Dickson and Zambrano.

136.    Defendants Gearity, Tiess, Dickson and Zambrano were/are responsible, personally and in her official capacity, in this instance for the wrongs perpetrated against Plaintiff and the damages it sustained.

137.    Defendant Village is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

138.    Accordingly, Plaintiff now demands judgment against Defendants Gearity, Tiess, Dickson and Zambrano and Defendant Village, for compensatory damages totaling One Hundred Thousand Dollars ($100,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

### FIFTH CAUSE OF ACTION
### AGAINST THE DEFENDANTS FOR FRAUD

139.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 138, inclusive, with the same force and

effect as if set forth at length herein.

140.    Defendants Village, Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, acting within the scope of their employment and under color of state law: (a) failed to conduct a fair, proper and reasonable investigation into SLH's alleged water usage in April 2015, (b) wrongfully secreted photographic evidence concerning that water usage, (c) failed to disclose to SLH that they knew that the Water Bills were incorrect, and (d) as a result of their action and inactions compelled SLH to file the Article 78 Proceeding to challenge the Water Bills knowing full well that the Water Bills were incorrect due to a misreading of the water meters.

141.    The conduct of Defendants Village, Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, in refusing to investigate a patently obvious error and in refusing to correct the astronomical Water Bills, in light of their actual notice that the Water Bills were excessive and incorrect, was intentional.  Instead of correcting known error, however, these Defendants threatened Plaintiff with penalties and interest and forced Plaintiff to incur tens of thousands of dollars in costs and to commence the Article 78 Proceeding in order to protect its clear rights. These Defendants purposefully lulled the Plaintiff into inaction so that the four-month statute of limitations would run and leave Plaintiff on the hook for baseless water charges of several hundred thousand dollars.

142.    Even after being forced to correct the Water Bills, the Defendants hid the proof of their malicious wrongdoing by willfully and repeatedly ignoring Plaintiff's repeated demands under FOIL for over nine months, after which it finally, after protests

by SLH, produced the "smoking gun" proof of their concealed misconduct in April 2016.

143.    As a direct and proximate result of these wrongful actions, SLH reasonably relied upon the representations of the Defendants that they were ignorant of any miscalculation of the Water Bills and SLH was thereby compelled to file the Article 78 Proceeding and incurred substantial, but unnecessary, legal fees and expenses.

144.    Due to the fraud perpetrated by Defendants Village, Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, in secreting significant evidence showing that SLH had been improperly charged for water due to a meter misreading, SLH sustained substantial fees and expenses.

145.    Each of the aforementioned Defendants is liable personally for these acts which damaged Plaintiff.

146.    Defendant Village is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

147.    Thus, Plaintiff SLH now demands judgment against Defendants Village, Gearity, Warren, Zambrano, Dickson, Tiess, Ferreira, DeMartino, and various John/Jane Does Defendant employees of the Village, for compensatory damages for their fraud totaling One Hundred Thousand Dollars ($100,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues.

WHEREFORE, Plaintiff demands JUDGMENT against Defendants as follows:

I.  For compensatory damages in the amount of One Hundred Thousand Dollars ($100,000.00);

II.  For punitive damages in the amount of Fifty Thousand Dollars ($50,000.00);

III.  For reasonable attorneys' fees, together with costs and disbursements of this action pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court;

IV.  For pre-judgment interest and post-judgment, as allowed by law; and

V.  For such other and further relief as this Court may deem just and proper.

Dated: Eastchester, New York
       October 23, 2018

                                        Respectfully submitted,
                                        Law Office of John F. Schutty, P.C.


                                        By: _*John F. Schutty*_____
                                             John F. Schutty
                                             (JS 2173)
                                        271 Main Street, 2nd Floor
                                        Eastchester, NY 10709
                                        Tel: (914) 202-0076
                                        Fax: (917) 591-5980
                                        Email: john@johnschutty.com